326 December 23, 2016 No. 35

IN THE OREGON TAX COURT
REGULAR DIVISION

CAPITAL ONE AUTO FINANCE, INC.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5197)

Plaintiff (taxpayer) initially appealed from a conference decision letter and notice of deficiency of Defendant Department of Revenue (the department). Subsequently, taxpayer filed a petition for special designation, which was granted and the case transferred to the Regular Division of the Tax Court. Taxpayer argued that it was not subject to taxation in Oregon under either the corporate excise tax or the corporate income tax laws for the income earned from the lending or depositing activities of its banks with respect to Oregon customers, arguing that banks must have a physical presence in Oregon to be subject to taxation, and taxpayer's banks did not have such physical presence. Taxpayer also argued that even if it was subject to taxation under Oregon law, the commerce clause of the federal constitution prohibited the state from imposing such taxes on the banks absent some physical presence. The department argued that taxation of income earned from sources within Oregon is based not on property rights or the physical presence of a taxpayer, but upon the substantial economic benefit conferred on a taxpayer in the conduct of its business. Granting the department's cross-motion and denying taxpayer's motion, the court ruled that no physical presence was required to subject out-of-state companies to the corporate income tax, and that due to the character, number, and purposefulness of the transactions, the amount of income earned from lending money to, and collecting fees from, an extended network of Oregon customers and vendors, and the usage of the debt enforcement mechanisms and the marketplace provided by Oregon, all led to the conclusion that taxpayer had significant business activity in Oregon, and that the income at issue had its point of origin in Oregon, from the Oregon resident customers and merchants. Therefore, the income of taxpayer's banks from their lending activities to Oregon customers was subject to taxation in Oregon.

Oral argument on cross-motions for partial summary judgment was held April 4, 2016, in the courtroom of the Oregon Tax Court, Salem.

Gregg D. Barton, Perkins Coie LLP, Seattle, filed the motion and argued the cause for Plaintiff (taxpayer).

Melisse S. Cunningham, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant Department of Revenue (the department).

Decision for Defendant rendered December 23, 2016.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This matter is before the court on cross-motions for partial summary judgment and stipulated facts.[1] This order addresses whether the corporate excise tax or the corporate income tax may be imposed on purely economic activity in the state without any physical presence by Plaintiff (taxpayer). *See* ORS 317.070; ORS 318.020.[2] The tax years at issue are 2006, 2007, and 2008. There are other issues before the court not addressed in this order.[3]

## II.   STIPULATED FACTS

During the tax years at issue, Capital One Financial Corporation (COFC) was the parent company of an affiliated group that filed a consolidated federal return. COFC and its subsidiaries, which were wholly-owned by COFC, were corporations incorporated, headquartered, and domiciled outside of Oregon.

One of COFC's subsidiaries, Capital One Auto Finance (taxpayer), "was authorized to conduct, and conducted, business in Oregon and other states." It offered "automobile and other motor vehicle financing products to consumers primarily through auto dealerships."

Taxpayer filed consolidated Oregon excise tax returns for tax years 2006, 2007, and 2008. The returns included taxpayer as well as Capital One Bank (COB),[4]

---

[1] Some facts were stipulated only for the limited purposes of these motions.

[2] Unless otherwise stated, the court's references to the Oregon Revised Statues (ORS) are to the 2009 edition. This is because tax years 2006, 2007, and 2008 were open to audit or examination and were audited by the department in 2011. Under Oregon Laws 2009, chapter 403, section 8, the 2009 amendments to ORS 314.280, 314.610, 314.615, 317.010, 317.070, and 317.090 apply prospectively and to any periods open to audit for the entities listed in amended ORS 314.610(4) (a) through (i). The entities at issue here are financial institutions as listed in ORS 314.610(4)(a) through (i).

[3] The parties agreed to stay discovery and argument on these issues pending the outcome of this decision.

[4] In 2006 and 2007, COB was a state-chartered credit card bank. In 2008, COB became a nationally-chartered bank renamed Capital One Bank (USA), N.A.

Capital One FSB (FSB),[5] and Capital One Services, Inc., all of which were subsidiaries of COFC. In those returns, taxpayer excluded from the numerator of the sales apportionment factor the gross receipts of COB and FSB (collectively referred to as "the Banks").[6]

The Banks did not obtain authorization to conduct business in Oregon. The Banks had no real or tangible personal property, offices, or employees in Oregon. In addition, at oral argument, Defendant Department of Revenue (the department) conceded, for purposes of these motions, that the receivables of the Banks are not located in Oregon.

COB "offered credit card products, other consumer loans, and deposit products to customers throughout the United States, including Oregon, and in certain international markets." FSB "accepted deposit products and engaged in consumer and small business lending to customers in Oregon and other states." These activities "were all from [their] offices outside of Oregon."

The Banks offered their products to Oregon customers primarily through direct mail solicitations that originated from locations outside of Oregon. These solicitations were designed to be sent to and received by customers and potential customers in Oregon. The Banks sent approximately 24,600,000 solicitations to Oregon customers over the course of 2007 and 2008. The number of solicitations sent in 2006 is unknown, but it is accepted by both parties to be materially the same.

The Banks had approximately 536,000 Oregon customers in 2007 and approximately 495,000 Oregon customers in 2008. The number of Oregon customers is not known for 2006, but it is accepted by both parties to be materially the same. The Banks sent monthly statements to their Oregon customers with outstanding credit card balances, and initiated lawsuits in Oregon in aid of collection against delinquent accounts in Oregon. The number of lawsuits in

---

[5] On June 30, 2007, Capital One FSB ceased doing business and merged into Capital One National Association.

[6] The motions do not address the propriety of any apportionment of gross receipts.

Oregon initiated by or for the Banks was equal to 2,502 in 2006; 9,824 in 2007; and 9,071 in 2008.

The Banks earned revenue from or related to transactions in which its customers used Capital One-branded credit cards in Oregon or engaged in other types of consumer lending in Oregon. These transactions included cash advances from Automatic Teller Machines (ATMs) located in Oregon but neither owned nor operated by the Banks (or any related Capital One entity), as well as purchases at vendors in Oregon. The types of fees that the Banks charged included finance charges, late fees, overlimit fees, annual membership fees, and interchange fees.[7] The amount of fees charged by the Banks totaled nearly $150,000,000 in each year for 2007 and 2008. The amount of fees charged by the Banks in 2006 is unknown, but it is accepted by both parties to be materially the same.

In 2011, the department audited taxpayer's corporate excise returns for tax years 2006, 2007, and 2008. The department determined that the Banks were subject to the corporate excise tax by reason of their lending and depositing activities and issued notices of deficiency. After holding a conference with taxpayer, the department issued notices of assessment including tax, penalty, and interest.[8]

Taxpayer appealed the notices of assessment to this court.

## III.   ISSUES

There are two issues before the court. The first issue is whether the Banks are subject to taxation in Oregon under either the corporate excise tax or the corporate income tax by reason of their economic activities with respect to Oregon customers.[9] The second issue is whether

---

[7] An interchange fee is the fee that is charged by the credit card company to the vendor for purchases made by the customer from a vendor.

[8] The amounts stated in the notices of deficiency assessment were based on adjustments to the sales factor numerator, "along with several unrelated adjustments, including federal RAR adjustments and the addback for other state taxes." Taxpayer has since amended its returns for 2007 and 2008 with additional RAR adjustments, but those returns have not been processed by the department.

[9] The court uses the term "economic activities" as a shorthand way to identify the various lending and depositing activities of the Banks with respect to

the economic activities of the Banks created substantial nexus for purposes of the Commerce Clause of the United States Constitution so as to permit taxation of the Banks in Oregon.

## IV.   ANALYSIS

Taxpayer argues that it is not subject to taxation in Oregon for the income earned from the lending or depositing activities of the Banks with respect to Oregon customers. Although taxpayer makes arguments under state and federal law, it essentially makes only one challenge to the tax imposed. That challenge is that the Banks must have a physical presence in Oregon to be subject to taxation.[10] Under Oregon's "first things first" doctrine, this court examines first the state law claims before addressing any federal law claims. *Hughes v. State of Oregon*, 314 Or 1, 12, 838 P2d 1018 (1992).

A.   *State Law Claims*

1.   *Determining the tax regimes at issue*

A preliminary question that must be addressed is what tax regimes are at issue. In its motion for partial summary judgment, taxpayer argued that the corporate excise tax in ORS chapter 317 does not reach to taxpayers who have no physical presence in Oregon. The department responded in two ways. First, it argued that the lending and depositing activities of the Banks do subject them to the corporate excise tax, regardless of the lack of physical presence in the state. Second, it argued that, even if the Banks are not subject to the excise tax, they are subject to the corporate income tax in ORS chapter 318.

In turn, taxpayer argues that it was not given proper notice that the department was asserting the corporate income tax as a basis for taxation. *See* ORS 305.885 (communication of basis for deficiency). However, after the

---

their Oregon customers when there was, for purposes of these motions, concededly no property, employees, or agents of the Banks in Oregon. The term "economic activities" is used to distinguish the facts of this case from one in which a taxpayer does have property, employees, or agents in Oregon.

[10] In other words, the Banks must have some physical presence of property, employees, or agents in Oregon.

notice of deficiency, the department is allowed to assert alternative grounds under ORS 305.575. The statutory provisions of ORS 305.575 authorize the departure from previously communicated reasons under ORS 305.885, so long as certain conditions are met. ORS 305.575 provides that this court may consider such alternative grounds if they are raised "before or at the hearing or any rehearing of the case." It also provides that the taxpayer is given additional time to amend or otherwise plead to the alternative grounds asserted. Taxpayer here did not request such additional time, and in fact argued in its response to the department's motion as to why it thinks that the corporate income tax does not reach to the activities of the Banks.

This court will consider the imposition of both tax regimes.

2.    *Determining the scope of the tax regimes at issue*

Oregon's corporate excise tax is "a tax measured by or according to net income *** for the privilege of carrying on or doing business in this state." ORS 317.010(5). It is imposed on financial institutions "doing business" in this state by ORS 317.070. "Doing business" is defined as "any transaction or transactions in the course of its activities conducted within the state by a national banking association, or any other corporation ***." ORS 317.010(4).

Oregon's corporate income tax is also a tax measured by or according to net income. Subject to certain exemptions,[11] it is imposed on corporations that have "Oregon taxable income derived from *sources* within this state." ORS 318.020(1) (emphasis supplied). "Income derived from sources within this state" is broadly defined, and *includes*

> "income from tangible or intangible property located or having a situs in this state and income from any activities carried on in this state, regardless of whether carried on in intrastate, interstate or foreign commerce."

ORS 318.020(2). Although ORS 318.020(2) includes examples of income from sources within Oregon, those examples

---

[11] ORS 318.040 provides that certain corporations are exempt from the corporate income tax.

are not exclusive. The term "source" is not defined by statute, but it is defined as "a point of origin" or "a point of emanation." *Webster's Third New Int'l Dictionary* 2177 (unabridged ed 2002). The income at issue in this case has its point of origin or point of emanation in Oregon, namely, the Oregon resident customers and merchants.

Despite being contained in separate chapters, the corporate excise and corporate income tax regimes were intended to operate as one cohesive tax regime. *See Cal-Roof Wholesale v. Tax Com.*, 242 Or 435, 441, 444, 410 P2d 233 (1966) (explaining that the corporate income tax "plugged the loophole" created by the highly formalistic decision, since abandoned, in *Spector Motor Service v. O'Connor*, 340 US 602, 71 S Ct 508, 95 L Ed 573 (1951)). Indeed, the corporate income tax only reaches to income not already subject to the corporate excise tax, and it taxes such income at the same tax rate. ORS 318.020(1) (referring to ORS 317.061). Further, ORS chapter 317 is incorporated in its entirety into ORS chapter 318, and both taxes are to be "administered as uniformly as possible." ORS 318.031.

Taxpayer argues that the Banks are not "doing business" in Oregon for purposes of the excise tax because they do not have a physical presence in Oregon, such as property, employees, or agents in the state. This court doubts that there is a physical presence requirement for purposes of the corporate excise tax.[12] However, even if there were

---

[12] There is no physical presence requirement appearing in the definition of doing business, the definition of the excise tax, or in the imposition of the excise tax on these corporations. *See* ORS 317.010(4), (5); ORS 317.070. Moreover, the Supreme Court has stated that the legislature intended the words "doing business" to have their usual meaning, which is "the engaging in activities in the pursuit of gain." *Welch Holding Co. v. Galloway*, 161 Or 515, 527, 89 P2d 559 (1939); *see also John I. Haas, Inc. v. Tax Com.*, 227 Or 170, 184, 361 P2d 820 (1961). The court focused on activities, not presence. It would seem to matter little whether a taxpayer has a physical presence in the state if that taxpayer is nevertheless engaged in activities in the pursuit of gain in the state.

In addition, this court has stated that the excise tax reaches to the federal constitutional limits, which, as will be seen, encompasses business activities conducted within the state without any physical presence of the taxpayer. *Ann Sacks Tile & Stone, Inc. v. Dept. of Rev.*, 20 OTR 377, 380-81 (2011). That statement was based in part upon the language contained in ORS 317.018. That statute provides that the intent of the legislature is

"[t]o make the Oregon corporate excise tax law, insofar as it relates to the measurement of taxable income, identical to the provisions of the federal

such a requirement, the income generated from Oregon customers by the Banks from their economic activities directed to Oregon is subject to the corporate income tax as "income derived from sources within the state."

With respect to the corporate income tax, taxpayer argues that the Banks possessed no property in Oregon, had no employees or agents in Oregon, conducted no physical activities in Oregon, and therefore earned no income from sources in Oregon. *See* ORS 318.020(2). Taxpayer essentially argues that the reach of ORS chapter 318 is short of the federal constitutional limits. That argument is counter to Oregon law.

The Oregon Supreme Court has indicated that ORS chapter 318 reaches to the federal constitutional limit. *Amer. Refrig. Transit Co. v. Tax Com.*, 238 Or 340, 346, 395 P2d 127 (1964). This court reaches that conclusion with the following observations.

First, this court in *American Refrigerator Transit* so stated. *Amer. Refrig. Transit Co. v. Commission*, 1 OTR 429, 434-35 (1963) (stating that the corporate income tax reaches "to the full extent permitted by the federal Constitution," such that "constitutionality and proper statutory construction are really one issue, turning upon the application of constitutional limitations upon state taxation of interstate commerce"). Second, the Oregon Supreme Court in no way questioned this court's conclusion as to the reach of ORS chapter 318. Indeed, the Supreme Court addressed *only* the federal constitutional limit in its opinion reversing this

---

Internal Revenue Code, as in effect and applicable for the tax year of the taxpayer, to the end that taxable income of a corporation for Oregon purposes is the same as it is for federal income tax purposes, *subject to Oregon's jurisdiction to tax*, and subject to the additions, subtractions, adjustments and modifications contained in this chapter."

ORS 317.018(1) (2011) (emphasis added). ORS 317.018 indicates that the legislature intends both that Oregon taxable income is to be based upon federal taxable income (with certain additions and subtractions) and that Oregon will tax all such income over which it has jurisdiction. There being no limitation in the Oregon constitution limiting the reach of the tax statutes at issue here, the phrase "subject to Oregon's jurisdiction to tax" indicates that the legislature intended to extend the reach of the corporate excise tax to the limits of federal law. The federal limit is important because, as a sovereign state, Oregon may exercise its inherent authority to tax however it chooses, unless its jurisdiction to do so is limited by the federal constitution or valid federal legislation.

court. It follows that the Supreme Court implicitly accepted this court's conclusion as to the statutory reach of ORS chapter 318.

Taxpayer attempts to distinguish *American Refrigerator Transit* because the taxpayer in that case at least had some tangible property in the state, even if temporarily and not under the taxpayer's direct control. However, the language of the Supreme Court is inescapable. "[N]exus [to tax] exists whenever the corporation takes advantage of the economic milieu within the state to realize a profit." 238 Or at 346. "To establish nexus it is necessary to show that the taxpayer has, in the conduct of his business, taken advantage of the economy of the taxing state to produce the income which is subjected to tax." *Id.* at 347. And, because "constitutionality and proper statutory construction [of the corporate income tax] are really one issue," 1 OTR at 435, if no physical presence is required for purposes of the federal constitution, then no physical presence is required to subject out-of-state companies to the corporate income tax.

Here, the department has effectively conceded that the Banks have no property in Oregon.[13] However, taxation of income earned from sources within the state is based not on property rights or the physical presence of the taxpayer, but upon the substantial economic benefit conferred on a taxpayer in the conduct of its business. Once again, the Supreme Court's language is clear that physical presence is not required under Oregon law. "[A]part from federal legislation, it would seem to us that income derived from the sale of goods in Oregon by a nonresident corporation relying entirely upon radio or television advertising would be taxable in this state." 238 Or at 347 (footnotes omitted). Taxpayers are subject to the corporate income tax based on their economic activities in the state.

3. *Activities of the banks in Oregon*

The Banks engaged in numerous activities with respect to Oregon customers, including marketing,

---

[13] By stipulation, the parties agreed for the limited purposes of these motions that the Banks had no real or tangible personal property, offices, or employees in Oregon. During oral argument, the department conceded for the limited purposes of these motions that the receivables of the Banks are not located in Oregon.

solicitation, acquisition, billing and collecting, and retention of Oregon customers. The Banks directed their activities to attract and retain customers in Oregon to earn revenue either directly or indirectly from Oregon customers.

The Banks engaged in marketing and solicited business in Oregon. The Banks directly and systematically sent into Oregon approximately 24,600,000 solicitations between 2007 and 2008. These solicitations were designed to stimulate demand in Oregon for the lending and credit capability of the Banks. The Banks supplied this demand to Oregon by extending credit and lending money to Oregon customers. The Banks extended credit or lent money to hundreds of thousands of customers in Oregon in 2006, 2007, and 2008.

The Banks earned money directly from Oregon customers. The Banks collected fees from hundreds of thousands of customers in Oregon, including finance charges, late fees, overlimit fees, and annual membership fees. These fees were the direct or indirect result of transactions entered into by Oregon customers while using Capital One branded credit cards and other financing products. These fees were billed to and paid by customers in Oregon. In addition, in circumstances where Oregon customers failed to pay, the Banks used the debt enforcement mechanisms provided by Oregon, including the courts, thousands of times each year to collect unpaid debts.

The Banks also earned money indirectly from their customers through their purchases in Oregon. When customers of the Banks purchased goods and services from Oregon vendors, the Banks earned revenue from interchange fees imposed on those transactions. These fees were the direct result of transactions entered into by Capital One customers while using Capital One branded credit cards to pay Oregon vendors.

### 4.   *Effect of the activities of the banks*

Either the excise tax, the income tax, or both apply to taxpayer's income and activities. Taxpayer is subject to assessment for the income earned by the Banks from their lending activities to Oregon customers.

The Banks did business in Oregon in the years in question, and a lot of it. They engaged in lending and other financial activities with respect to their customers in Oregon in the pursuit of earning income through interest and fee charges. They were able to do business in Oregon without a physical presence, but they were still doing business in Oregon.

However, even if the Banks were not doing business in Oregon for purposes of the excise tax, they were, under any definition, earning income from "sources within the state" for purposes of the corporate income tax. By lending money and charging fees to Oregon customers and vendors, the Banks extracted upwards of $150,000,000 in fees from Oregon each year in 2007 and 2008.[14] Those fees emanated from Oregon and originated from Oregon customers and vendors, regardless of the physical presence of the Banks. Dollars paid to the Banks by their Oregon customers, whether cardholders or vendors, have their source in Oregon.

The character, number, and purposefulness of these transactions; the amount of income earned from lending money to, and collecting fees from, an extended network of Oregon customers and vendors; and the usage of the debt enforcement mechanisms and the marketplace provided by Oregon all lead to one conclusion. Whether "doing business" in Oregon for purposes of the Oregon excise tax or earning income "derived from sources within this state" for purposes of the Oregon income tax, the Banks directed their activities to access and extract economic benefits from Oregon persons. The income of the Banks for their lending activities to Oregon customers is subject to taxation in Oregon.

B.  *Federal Law Claims*

Because taxpayer is subject to state taxation in Oregon by reason of the economic activities of the Banks, the only question that remains for purposes of this order is whether the economic nexus of the Banks is sufficient for purposes of the Commerce Clause of the federal

---

[14] The amount of fees earned in 2006 is unknown, but it is accepted by the parties to be materially the same.

constitution.[15] Taxpayer argues that economic activity alone is not sufficient to satisfy the substantial nexus requirement of the Commerce Clause and therefore the Banks do not have substantial nexus with Oregon.

Without question, "the [Supreme] Court consistently has indicated that 'interstate commerce may be made to pay its way,' and has moved toward a standard of permissibility of state taxation based upon its actual effect rather than its legal terminology." *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 281, 97 S Ct 1076, 51 L Ed 2d 326 (1977). Moreover, where a state has "provided benefits and protections" for a taxpayer's business activities in the state, the state "is justified in asking [for] a fair and reasonable return" in the form of a "nondiscriminatory properly apportioned state corporate tax[]." *Id.* at 287. State taxation is permissible for purposes of the Commerce Clause if the tax is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.* at 279. The state must have "a connection to the activity itself, rather than a connection only to the actor the State seeks to tax." *Allied-Signal, Inc. v. Director, Tax Div.*, 504 US 768, 778, 112 S Ct 2251, 119 L Ed 2d 533 (1992).

The principal case relied upon by taxpayer is *Quill Corporation v. North Dakota*, 504 US 298, 112 S Ct 1904, 119 L Ed 2d 91 (1992). In that case, the United States Supreme Court held that physical presence is required to establish Commerce Clause substantial nexus where a duty to collect sales or use taxes is at issue. *Id.* at 317-19. However, in doing so, the Court overruled in part its prior decision in *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 US 753, 87 S Ct 1389, 18 L Ed 2d 505 (1967). In *Bellas Hess*, the Court held that a physical presence was required to satisfy both the Due Process and Commerce Clauses. For purposes of the Due Process Clause, the *Quill* Court held that a corporation that "purposefully avails itself of the benefits of an economic market in the forum State"—*i.e.*, a corporation that "purposefully direct[s] its activities" to "residents" of

---

[15] Taxpayer makes no argument that state taxation of solely economic activity is invalid under the Due Process Clause.

the state—may be subjected to taxation in that state without violation of the Due Process Clause. *Quill*, 504 US at 307-08.

In arguing that physical presence is required for purposes of the Commerce Clause in respect of the need to pay income taxes, taxpayer relies upon a questionable standard of constitutional law. In 2015, Justice Kennedy called for the legal community to find an appropriate case for the Court to reexamine its holdings in *Quill* and *Bellas Hess*. *Direct Marketing Ass'n v. Brohl*, 575 US 1, 135 S Ct 1124, 1135, 191 L Ed 2d 97 (2015) (Kennedy, J., concurring). However, until the Supreme Court overrules or modifies its holding in *Quill*, this court is bound by it.

Regardless, nothing in *Quill* imposes a physical presence standard for Commerce Clause nexus outside the realm of collection obligations for sales or use taxes. The Court noted the "magnitude" of *Quill's* contacts with the state—all without a physical presence—for purposes of the Due Process nexus standard, *id.* at 308, but nevertheless found that physical presence was necessary to impose a sales or use tax collection obligation. The Court in *Quill* rested that opinion on two bases. The first basis is that imposing sales or use taxes on out-of-state taxpayers with no physical presence in the state creates an undue burden. The second basis is that there are settled expectations with respect to a physical presence standard in the realm of sales or use taxes.

1.  *Oregon has not imposed an undue burden on inter-state commerce*

The Commerce Clause nexus requirement is intended to "limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce." *Quill*, 504 US at 313. In its assessment of the burdens of a sales or use tax collection obligation on out-of-state taxpayers, the Court was aware that there were over six thousand sales or use tax jurisdictions. *Id.* at 313 n 6. In each one of those jurisdictions, a taxpayer could be charged with both collecting and remitting tax in often substantially different tax regimes. *Id.* The Court had previously stated in *Bellas Hess* that the "many variations in

rates of tax, in allowable exemptions, and in administrative and recordkeeping requirements could entangle [an out-of-state vendor] in a *virtual welter of complicated obligations*." 386 US at 759-60 (footnotes omitted; emphasis added). The Court in *Quill* appears to have adopted this finding. 504 US at 313 n 6.

Beyond asserting that the corporate excise or income tax regimes create an undue burden as applied to the Banks, taxpayer does not seriously advance the argument. Taxpayer has introduced no evidence of a "*welter*" of obligations arising from states requiring an out-of-state taxpayer to pay a tax based upon net income for the income earned in the state. Nor does it seem likely that it could. The department argues—and taxpayer does not appear to dispute—that the burdens associated with excise or income tax regimes are much less onerous than sales or use tax regimes. This court agrees.

Simply put, the record does not support a finding that there are thousands of income or excise tax regimes with which a taxpayer must comply. Perhaps more importantly, with respect to income or excise taxes, there is no burden of *collecting* the tax from third parties. The scope of that burden in the sales or use tax context looms large. A taxpayer must ensure that the appropriate amount (and not more or less) is collected from the customer and directed to the appropriate taxing authority within the appropriate time. In the case of the collection of sales or use taxes, all of these obligations must be determined *before* a taxpayer makes its first sale into a jurisdiction. Otherwise, the taxpayer will likely fail in collecting and remitting the appropriate sales or use tax.

While collection and remittance of sales or use taxes is not an undue burden in and of itself, it can become one if the seller does not reasonably know whether it will have substantial nexus with the taxing state, or has minimal sales in a number of taxing jurisdictions. No such argument can be made with respect to Oregon's corporate excise or income taxes. Those taxes do not have a requirement of collection from third parties, and are paid based upon the income earned in the state as determined at the end of a

tax period and not at the beginning. This court concludes that imposition of the corporate excise and income taxes on economic activity does not constitute an undue burden on interstate commerce.

2.  *There are no "settled expectations" to upset with respect to income taxes*

The other basis for the *Quill* Court's physical presence nexus standard was settled expectations. That basis was composed of two components. First, the Court considered the benefit of the "settled expectations" of taxpayers that result from a bright-line rule. *Quill*, 504 US at 316. The rise of, and investment in, the mail-order industry was, at least arguably, in part related to the bright-line physical presence standard announced in *Bellas Hess. Id.*

Second, the Court considered the "settled expectations" resulting from the doctrine of *stare decisis*, noting that the physical presence rule in *Bellas Hess* had "engendered substantial reliance and has become part of the basic framework of a sizable industry." *Id.* at 317. Where industry had extensively relied on that rule, and Congress had the power to displace it,[16] the Court refused to "renounce the bright-line test of *Bellas Hess.*" *Id.* at 318.

Curiously, taxpayer's argument regarding settled expectations proceeds under neither the necessity of a bright-line rule nor the role of *stare decisis*. Taxpayer has not argued, or shown, that the rise or prominence of the financial services industry was dependent on a bright-line physical presence requirement with respect to income or excise taxes. Nor has taxpayer argued, or shown, that there

---

[16] As to this point, the Court stated:

"No matter how we evaluate the burdens that use taxes impose on interstate commerce, Congress remains free to disagree with our conclusions. Indeed, in recent years Congress has considered legislation that would 'overrule' the *Bellas Hess* rule. Its decision not to take action in this direction may, of course, have been dictated by respect for our holding in *Bellas Hess* that the Due Process Clause prohibits States from imposing such taxes, but today we have put that problem to rest. Accordingly, Congress is now free to decide whether, when, and to what extent the States may burden interstate mail-order concerns with a duty to collect use taxes."

*Quill*, 504 US at 318 (citation and footnote omitted).

is or was a uniform body of law on this issue upon which it relied.[17]

Taxpayer proceeds under what might be termed an estoppel argument—which is not favored—based on action (or inaction) by the department and the State of Oregon.[18] That action (or inaction) includes: (1) the department previously audited taxpayer, but did not subject the Banks to the excise tax; (2) the department indicated in survey responses that soliciting and issuing credit cards does not create nexus; (3) the department unsuccessfully petitioned the legislature to adopt a statutory factor presence nexus statute; (4) the department advised the legislature that making, purchasing, and holding unsecured and secured debt in Oregon did not create nexus in Oregon; (5) the department's internal policy in 2006 stated that issuing credit cards alone did not create nexus in Oregon; (6) there was no statute or rule that clearly stated that economic presence is sufficient; (7) the department in 2007 said that any rule addressing economic nexus would be applied prospectively; and (8) the department had not previously asserted its taxation authority against a taxpayer based on economic nexus alone.

According to taxpayer, the department's pronouncements regarding nexus were "so predominate, [they] took on the effect of unwritten rules upon which taxpayers relied as if written." Taxpayer also argues that any "contrary interpretation" by the department would be akin to "ad hoc decision-making in violation of Article I, section 20[,] of the Oregon Constitution" (Oregon's privileges and immunities clause). However, the department's pronouncements do not serve as a basis for estoppel.

---

[17] It could not. For example, in 2006 the Supreme Court of Appeals of West Virginia held that the physical presence requirement only applied to sales and use taxes. *See Tax Comm'r v. MBNA Am Bank, NA*, 640 SE2d 226 (W Va 2006). The Supreme Court denied *certiorari*. 551 US 1141 (2007). Taxpayer has state cases in support of its position too, which were also denied *certiorari* by the Supreme Court, but that only exemplifies the lack of clarity or "settled expectations" in the law.

[18] In *Johnson v. Tax Commission*, the Oregon Supreme Court held that estoppel could apply to tax collectors. 248 Or 460, 463, 435 P2d 302 (1967). However, "[t]he policy of efficient and effective tax collection makes the doctrine of rare application." *Id.* at 463.

Estoppel only applies if three elements are satisfied. First, there must be "proof positive that the collector has misinformed the individual taxpayer." *Johnson v. Tax Commission*, 248 Or 460, 463, 435 P2d 302 (1967). Second, the taxpayer must have a "particularly valid reason for relying on the misinformation." *Id.* at 463-64. Third, it must be "inequitable to a high degree to compel the taxpayer to conform to the true requirement." *Id.* at 464. These elements have been generalized in recent years as "(1) misleading conduct on the part of the department; (2) taxpayer's good faith, reasonable reliance on that conduct; and (3) injury to taxpayer." *Webb v. Dept. of Rev.*, 18 OTR 381, 383 (2005), citing *Society of St. Vincent DePaul v. Dept. of Rev.*, 14 OTR 47, 50 (1996).

The record is devoid of evidence that either this taxpayer or taxpayers generally relied on case law or any of the statements of the department in entering into or continuing business operations in Oregon. Moreover, any reliance on such statements is not reasonable given the language of the Oregon Supreme Court in *American Refrigerator Transit*, and the adoption of the department's substantial nexus guidelines in Oregon Administrative Rule (OAR) 150-317-0020. This is so even as to the department's statement, during notice and comment prior to final promulgation, that the substantial nexus rule would only be applied prospectively.

First, the rule as published was not so limited, and there was clear Oregon Supreme Court precedent holding that a rule not so limited applies to any periods open to examination. *U.S. Bancorp v. Dept. of Rev.*, 337 Or 625, 639, 103 P3d 85 (2004); *see* OAR 150-305-0014 (formerly OAR 150-305.100-(B)). Second, even if the rule did not apply retroactively to open periods, any reliance on department statements contrary to the broad language in *American Refrigerator Transit* cannot be viewed as reasonable. Indeed, the department stated during notice and comment that it did not believe it was "extending" Oregon law, but rather was attempting to provide "clarity" on that law.

Taxpayer's estoppel claim fails. Even if taxpayer could show that its employees actually read any of materials

upon which it now relies—and nothing in the record supports that conclusion—such reliance would not have been reasonable.

Finally, this court notes that what appears to be an estoppel argument by this taxpayer is not the type of reliance or "settled expectations" discussed in *Quill*. The Court in *Quill* addressed expectations that were settled and led to initiating or continuing economic contact with a state. There is nothing in the record that supports any argument that this taxpayer entered into or continued its business contacts in Oregon in reliance on any court decision or action of the department. An appropriate analysis of settled expectations under *Quill* does not support restricting the application of the corporate excise and income tax regimes only to taxpayers with a physical presence in Oregon.

Consideration of the importance of a bright-line rule, when concerning settled expectations, parallels the considerations discussed above with respect to undue burdens. For sales and use taxes, a corporation would here again need to know at the first sale what its obligations are and whether it would have substantial nexus with the state such that it would need to collect and remit the tax to the state. The benefit of a bright-line physical presence rule is clear.

For excise or income taxes, however, the corporation can periodically evaluate whether its activities have created or will create substantial nexus such that it needs to pay tax based on its income in the state. Notably, there is no collection of tax from customers that must occur. The burden on the taxpayer is much less onerous than a sales or use tax. Accordingly, the benefit of, and need for, a bright-line physical presence rule is diminished.

Next, as to consideration of the role of *stare decisis*, there is no clear Supreme Court precedent with respect to income or excise taxes that requires a physical presence for such taxes. This is markedly different from the situation that existed under *Bellas Hess* in respect of obligations to collect sales or use taxes. Indeed, the question in this case has been litigated across the country by taxpayers and

taxing authorities with varying degrees of success on both sides.[19]

### 3. *Substantial nexus may be established by sufficient economic presence*

The Court in *Quill* rejected a physical presence standard in lieu of an economic nexus standard for purposes of the Due Process Clause because the Court understood that "modern commercial life" does not require physical presence in a state to attract business.[20] *See* 504 US at 308 (stating "it matters little that such solicitation is accomplished by a deluge of catalogs rather than a phalanx of drummers"). If there are sufficient economic contacts with the state, an out-of-state business "may be made to pay its way." *Complete Auto Transit, Inc.*, 430 US at 281.

The only two reasons the *Quill* Court gave for departing from its Due Process economic nexus analysis to impose a physical presence standard for Commerce Clause nexus for the collection of sales or use taxes were considerations of undue burden and settled expectations. As discussed, neither of these bases require or even suggest that courts should adopt a physical presence requirement under the Commerce Clause for taxes imposed upon or measured by net income. There are no special circumstances—such as a collection requirement or six thousand tax jurisdictions—that would run counter to the conclusion that a state can exact a reasonable tribute for the economic marketplace it has helped maintain in Oregon. As the Supreme Court has repeatedly recognized, "the State's power to tax an individual's or corporation's activities is justified by the 'protection,

---

[19] Compare those cases cited by taxpayer in support, *Scioto Ins. Co. v. Okla. Tax Comm.*, 279 P3d 782 (Okla 2012); *Rylander v. Bandag Licensing Corp.*, 18 SW3d 296 (Tex App 2000); *J.C. Penney Nat'l Bank v. Johnson*, 19 SW3d 831 (Tenn Ct App 1999), with those cases cited by the department in support, *Capital One Bank v. Comm'n of Revenue*, 899 NE2d 76 (Mass 2009); *Geoffrey, Inc v. Comm'r of Rev*, 899 NE2d 87 (Mass 2009); *MBNA Am Bank, NA & Affiliates v. Indiana Dept. of State Revenue*, 895 NE2d 140 (Ind Tax 2008); *Bridges v. Geoffrey, Inc.*, 984 So 2d 115 (La App 2008); *MBNA Am Bank, NA*, 640 SE2d 226. Recently, the Ohio Supreme Court held that physical presence is not required under the Commerce Clause to subject an out-of-state taxpayer to a business privilege tax. *Crutchfield Corp. v. Testa*, 88 NE3d 900 (Ohio Nov 17, 2016) (Slip Op No. 2016-Ohio-7760) WL 6775765.

[20] The Banks here are a case in point.

opportunities and benefits' the State confers on those activities."[21] *Allied-Signal, Inc.*, 504 US at 778 (quoting *Wisconsin v. J.C. Penney Co.*, 311 US 435, 444 (1940)).

### 4.   *The banks have substantial nexus in Oregon*

The court must now consider whether the economic presence of the Banks in Oregon rises to the level of substantial nexus.

Substantial nexus is a requirement designed to "limit[] state burdens on interstate commerce." *Quill*, 504 US at 313. There must be, outside any connection with customers via common carriers, more than a "'slightest presence'" to satisfy the nexus requirement. *Id.* at 315 n 8 (citing *Nat'l Geographic Soc. v. California Bd. of Equalization*, 430 US 551, 556 (1977)).

The activities of the Banks created substantial economic nexus in Oregon. The Banks repeatedly extended credit, loaned money, pursued collection, and earned revenue in Oregon. This is not a case of a taxpayer having only a "slightest presence" in Oregon. *Quill*, 504 US at 315 n 8. There was extensive contact in the state of Oregon by the Banks.

The Banks sent approximately 24,600,000 solicitations into Oregon between 2007 and 2008 for the purpose of obtaining and retaining customers.[22] In part because of those solicitations, the Banks had 536,000 Oregon customers in 2007 and 495,000 Oregon customers in 2008.[23] To those customers, the Banks engaged in a variety of types of consumer lending or depositing activities. From those lending or depositing activities, the Banks charged nearly $150,000,000 in fees in each year for 2007 and

---

[21] Recall, however, that the power to tax is not without limit. A tax must also be fairly apportioned, nondiscriminatory, and "fairly related to the services provided by the State." *Complete Auto Transit, Inc.*, 430 US at 279; *see Stonebridge Life Ins. Co. I v. Dept. of Rev.*, 18 OTR 423 (2006) (holding that the imposition of the insurance excise tax was unconstitutional as to apportionment).

[22] The number of solicitations sent in 2006 is unknown, but it is accepted by the parties to be materially the same.

[23] The number of Oregon customers in 2006 is unknown, but it is accepted by the parties to be materially the same.

2008.[24] To collect amounts due, the Banks routinely sent statements to their Oregon customers with their current balances. When Oregon customers failed to pay the fees or balances due, the Banks initiated collection lawsuits against them *in Oregon*. The number of collection lawsuits initiated by or for the Banks was 2,502 in 2006, 9,824 in 2007, and 9,071 in 2008. The Banks had more than a mere "slightest presence" in Oregon.

If the Banks were unable to lend money to or accept deposits from Oregon customers, they could not charge fees. And even if they could charge such fees, the Banks would not be as successful in their business if they could not resort to debt enforcement mechanisms to collect these fees. Oregon has created a marketplace and business atmosphere, an "economic mileu" in the terms of *American Refrigerator Transit*, which makes consumer lending possible and profitable. The Banks have taken advantage of that "economic mileu"—the "protection, opportunities and benefits" afforded by Oregon. *Wisconsin v. J.C. Penney Co.*, 311 US at 444. They "may be made to pay [their] way." *Complete Auto Transit, Inc.*, 430 US at 281 (internal quotation marks omitted). The Banks had substantial nexus with Oregon in 2006, 2007, and 2008.

## V.   CONCLUSION

The corporate excise tax and corporate income tax regimes operate as one cohesive tax scheme. Between the two taxes, Oregon taxes the income from economic activities in Oregon. Taxpayer earned income from economic activities in Oregon. Such taxation is permissible without violating the Commerce Clause if there is also substantial nexus with the taxpayer. Substantial nexus can be established by economic presence alone. Taxpayer's significant economic activities in Oregon established substantial nexus with Oregon. Now, therefore,

IT IS ORDERED that Plaintiff's motion for partial summary judgment is denied; and

IT IS FURTHER ORDERED that Defendant's motion for partial summary judgment is granted.

---

[24] The amount of fees earned in 2006 is unknown, but it is accepted by the parties to be materially the same.